*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SCOTT ALAN BAKER,

UNPUBLISHED
June 27, 2024

Plaintiff-Appellant,

v

No. 364555
Bay Circuit Court
LC No. 2021-003190-DO

KERRY COMISSIONG BAKER,

Defendant-Appellee.

Before: O'BRIEN, P.J., and M. J. KELLY and FEENEY, JJ.

PER CURIAM.

Plaintiff appeals as of right the parties' judgment of divorce. On appeal, plaintiff takes issue with (1) the manner in which the trial court calculated plaintiff's annual income for purposes of determining spousal support and (2) the trial court's ordering plaintiff to "contribute the sum of $10,000.00 toward the attorney fees and costs incurred by" defendant. We affirm the trial court's calculation of plaintiff's income but reverse its award of $10,000.

## I. BACKGROUND

The parties were married in 1989. Plaintiff worked as an ear, nose, and throat doctor, while defendant worked as a physical therapist. Plaintiff ran his own practice and was the sole owner of Baker Ear, Nose, and Throat Associates PLC (Baker ENT). Defendant ran her own business between 2017 and 2022, and worked for Mid-Michigan Physical Therapy and Rehab Specialists at the time of trial.

Timothy Quast, the accountant for Baker ENT, testified that plaintiff had structured his practice so that he did not receive an income in the form of wages. Christopher Sheridan, a certified public accountant, explained that plaintiff was "not allow[ed]" to receive a "W-2 wage" because he chose to set up Baker ENT as a "schedule C" for tax purposes.

Plaintiff testified that he did not have a personal credit card for at least ten years before the parties separated in 2022, and that he used the Baker ENT credit card for his personal expenses. Quast and plaintiff reported that some of plaintiff's personal expenses were paid for using draws from Baker ENT. Quast explained that plaintiff's draws would come from either the net income

of the practice or from money that the practice borrowed. According to Quast, between 2019 and 2021, plaintiff increased Baker ENT's debts "to the banks and [to] the [Small Business Administration]" from $0 to $352,390. This included establishing a line of credit. Quast said that this "money was available for draws, and was used, in fact, for draws, over many of those last three years." He added that plaintiff would need to earn an additional $118,000 per year pretax to retire Baker ENT's $352,390 debt within five years.

Quast reported that, in 2019, plaintiff withdrew $65,000 from Baker ENT's line of credit, $45,496.87 of which went toward the purchase of a house for the parties' son, and the other $20,000 of which was used for home improvements. Because this $65,000 was taken from Baker ENT's line of credit, it could not be separated out from the other expenses (both business and personal) that the line of credit was used to pay for. When Quast was asked how much of Baker ENT's line of credit "represents the balance on the house that was purchased for [the parties' son]," Quast reiterated that it was "not possible" to know because of the nature of a line of credit—while plaintiff made payments on the line of credit, those payments, Quast explained, were "not attributable to any one asset" but instead paid down the overall debt. Quast opined that, while the $65,000 draw on Baker ENT's line of credit "was used to acquire something personally," it did not "represent income at that time" because it was a liability that had to be repaid.

Plaintiff testified that, in May 2021, after "things had deteriorated" and the parties "decided to get divorced," he withdrew $55,000 from Baker ENT to pay the down payment on a new house for himself, and another $24,283 to cover six months of payments toward that house. Plaintiff said that he also paid a retainer for his divorce attorney through a $10,000 draw from Baker ENT.

Robert Looby, a certified public accountant who testified on behalf of plaintiff, was asked to determine an appropriate income to attribute to plaintiff. Looby believed that an appropriate estimate of plaintiff's average net income for the past three years was $380,000. Looby calculated this estimate by considering information provided by Quast's office on plaintiff's financial statements, including Baker ENT's net income, stimulus payments, and government loans that were forgiven. Looby explained that he considered the stimulus payments and forgiven loans as sources of income to normalize plaintiff's income during years in which his practice was hindered by the pandemic. Looby noted, however, that plaintiff would also be responsible for "healthcare costs" and "the self-employment tax," which would reduce his overall income. Looby believed that taking these reductions would "put [plaintiff's] income right around 340 to $345,000."

Looby opined that net income and distributions from a business should be considered separately. Looby explained that distributions "just reflect[] what you've drawn out of the business," so distributions could be more than income one year and less the next. "The distributions don't have anything to do with your net income," Looby said.

Sheridan, who testified on behalf of defendant, was also asked to estimate an appropriate amount of income to attribute to plaintiff. Sheridan believed that plaintiff's income should be calculated by looking at the total money that plaintiff received from Baker ENT. This was because, according to Sheridan, plaintiff's "way of earning a W-2 wage [was] taking out the excess cash that's left over in the business." In other words, Sheridan believed that all of the "excess cash that [plaintiff] received" from Baker ENT constituted plaintiff's "compensation" from his practice. The average of Baker ENT's payments to plaintiff over the last three years was $443,280, Sheridan

said. This was not plaintiff's taxable income, Sheridan clarified, but was "money that's going straight into [plaintiff's] pocket that he can then pay personal expenses with or do with what he would please."

To ensure that his estimate of plaintiff's income "made sense," Sheridan performed five "sanity" or "validity checks." These checks, Sheridan explained, were surveys of the industry to see "what would the industry tell me someone in this position, this industry, with this experience, what would they earn as a reasonable compensation . . . ." Sheridan said that his "sanity checks" confirmed that his $443,000 estimate for plaintiff's income was reasonable.

Quast disagreed with Sheridan and opined that plaintiff's draws from Baker ENT should not be the basis for determining plaintiff's income. This was because, according to Quast, those draws were sometimes taken against a bank loan that the practice was still obliged to repay. When asked to provide an annual wage for plaintiff, Quast said that, considering plaintiff's debt obligations, a reasonable average annual income attributable to plaintiff was $320,000.

The trial court, in an opinion from the bench, said that Quast and Looby were "good experts" but "their analysis was all based on net income, which is essentially a tax analysis." This was not entirely reflective of plaintiff's income, the court opined, because plaintiff relied on Baker ENT's credit card and cash draws from the business to fund his personal expenses, yet Quast and Looby's analysis did not necessarily look at these charges and draws as benefits that plaintiff received from Baker ENT as compensation. Instead, they reviewed plaintiff's charges and draws to "sort out what's taxable and what's not taxable" to "come up with a net income figure upon which he pays income tax." The court believed that Sheridan's analysis was more "appropriate" for determining plaintiff's income because it focused on "the benefits" that Baker ENT conferred on plaintiff. The court accordingly adopted Sheridan's analysis to determine plaintiff's income for purposes of calculating the spousal-support award. As for attorney fees, the court said:

> I'm going to not order attorney fees under the rule, because I think [defendant] has the ability to pay, and in light of the settlement and the spousal support; however—except I am going to . . . allow a $10,000 offset from any balance that she owes under the property settlement. That's under the theory that . . . [plaintiff] took $10,000 from the marital estate.

In the judgment of divorce that followed, under the heading "Cash Settlement," the court said that it was "the order of this Court that [plaintiff] shall contribute the sum of $10,000.00 toward the attorney fees and costs incurred by" defendant.

This appeal followed.

## II. SPOUSAL SUPPORT

Plaintiff first challenges the trial court's spousal-support award. According to plaintiff, the trial court erred by adopting Sheridan's analysis for determining plaintiff's earnings for purposes of calculating the spousal-support award because some of plaintiff's draws from Baker ENT came from loans that Baker ENT had to repay. We disagree.

-3-

## A. STANDARD OF REVIEW

This Court reviews for an abuse of discretion a trial court's decision regarding spousal support. *Loutts v Loutts*, 309 Mich App 203, 209; 871 NW2d 298 (2015). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Berger v Berger*, 277 Mich App 700, 723; 747 NW2d 336 (2008). Findings of fact are reviewed for clear error. MCR 2.613(C). A finding is clearly erroneous if, after reviewing the entire record, this Court is left with the definite and firm conviction that a mistake was made. *Loutts*, 309 Mich App at 209. This Court gives deference to a trial court's ability to judge the credibility of witnesses that appear before it. *Draggoo v Draggoo*, 223 Mich App 415, 429; 566 NW2d 642 (1997). If the trial court's findings are not clearly erroneous, this Court must determine whether the dispositional ruling was fair and equitable in light of the facts. *Loutts*, 309 Mich App at 209. A trial court's dispositional ruling must be affirmed unless this Court is firmly convinced that it was inequitable. *Id*.

## B. ANALYSIS

"The object in awarding spousal support is to balance the incomes and needs of the parties so that neither will be impoverished; spousal support is to be based on what is just and reasonable under the circumstances of the case." *Berger*, 277 Mich App at 726.

Plaintiff's central complaint on appeal is that the trial court treated debt incurred by Baker ENT as "income" to plaintiff for purposes of determining spousal support. We disagree with the premise of this argument, however—the trial court did not treat debt incurred by Baker ENT as plaintiff's income. Rather, the court treated benefits that Baker ENT conferred on plaintiff as plaintiff's earnings. This is not unusual. For instance, this Court in both published and unpublished cases has recognized that distributions from a party's business can be considered part of that party's income in divorce proceedings. See, e.g., *Elahham v Al-Jabban*, 319 Mich App 112, 124; 899 NW2d 768 (2017) ("With regard to the distributions from the medical practice, the evidence in the record indicates that this amount was considered part of defendant's income for the purpose of determining the marital property division."); *Juarez v Juarez*, unpublished opinion of the Court of Appeals, issued December 12, 2013 (Docket No 310470), p 9 (recognizing that "the distributions from [the defendant's business] were factored into defendant's total income" as part of determining spousal support).

Plaintiff seems to believe that the trial court could not simply look at the benefits that Baker ENT conferred on plaintiff to determine plaintiff's earnings, but had to determine where Baker ENT got the money to pay for those benefits. If the court did so, plaintiff explains, the court would have seen that Baker ENT increased its debt to pay for the benefits it conferred on plaintiff. From this, plaintiff concludes that the benefits that Baker ENT conferred on plaintiff cannot be plaintiff's income because Baker ENT used loaned money that it had to repay to confer those benefits. Problematically, plaintiff offers no legal authority to support his contention that the trial court was

required, as a matter of law,[1] to consider whether Baker ENT conferred benefits on plaintiff using money from loans or from some other source. While the trial court was free to consider this fact and others that it deemed relevant, we discern no error in the trial court's decision to not consider where Baker ENT got the money to pay for the benefits it conferred on plaintiff, and to instead base its determination of plaintiff's income on only the value of those benefits.

Notwithstanding this dispositive conclusion, we also conclude that the factual basis for plaintiff's argument—that Baker ENT used $352,390 in borrowed money to pay for the benefits it conferred on plaintiff—is not supported by the record. Plaintiff contends that because Sheridan's calculation of plaintiff's earnings exceeded Baker ENT's profits, Baker ENT must have paid for the benefits it conferred on plaintiff using the debt it incurred. But that is not so. It is unclear where the money went that Baker ENT borrowed. While Quast testified that plaintiff took some personal draws from Baker ENT's line of credit, he never specified how much. Quast also confirmed that Baker ENT's line of credit had been paid down but could not say which loans taken out on Baker ENT's line of credit were repaid, making it unclear whether Baker ENT had repaid the loans that plaintiff took out as personal draws. The mere fact that the amount in benefits that Baker ENT conferred to plaintiff exceeded Baker ENT's profits does not demonstrate that Baker ENT paid those benefits using the $352,390 in debt it incurred, contrary to plaintiff's argument.

Still, plaintiff rightly points out that if he had taken out loans as an individual instead of taking the loans out through Baker ENT, the money from the loans would not be considered earnings for purposes of a spousal-support award. But plaintiff wrongly claims that this supports his position. There is no dispute that plaintiff did not incur the debt at issue; the debt was incurred by Baker ENT. Plaintiff and Baker ENT are distinct legal entities, and the debt is not collectable on plaintiff as an individual.[2] In fact, because Baker ENT holds the debt, it impacts defendant as well as plaintiff because defendant has a 50% interest in Baker ENT under the judgment of divorce.

Ultimately, the issue is whether the trial court appropriately determined plaintiff's income for purposes of the spousal-support award. Plaintiff contends that the trial court should have limited plaintiff's earnings to Baker ENT's profits, as Quast and Looby suggested. While the trial court found Quast and Looby to be "good experts," it believed that they offered "essentially a tax analysis," and it thought that Sheridan's alternative analysis was more "appropriate." Sheridan's analysis did not limit itself to Baker ENT's profits but considered all funds that plaintiff actually took home from Baker ENT. Even if, under Sheridan's analysis, some of the benefits that Baker ENT conferred on plaintiff were paid for using borrowed money, the trial court's decision to adopt Sheridan's analysis was not an abuse of discretion. We are also not firmly convinced that it was inequitable for the trial court to calculate plaintiff's income by considering the benefits that Baker ENT conferred on plaintiff. This portion of the judgment of divorce is accordingly affirmed.

---

[1] In his reply brief, plaintiff rejects defendant's framing of this issue as "some kind of factual dispute" and contends that this is "a legal question."

[2] For this reason, we disagree with plaintiff that this opinion could support a trial court "theoretically order[ing] an individual to pay support based on the assumption that the individual will borrow money."

### III. $10,000 AWARD

Plaintiff next takes issue with the trial court's decision to award a $10,000 offset to defendant, which plaintiff was ordered to pay towards defendant's "attorney fees and costs," because plaintiff used a $10,000 draw from Baker ENT to pay his attorney. We agree with plaintiff that this $10,000 award was improper under the facts of this case.

### A. STANDARD OF REVIEW

A trial court's award of attorney fees in a divorce action is reviewed for an abuse of discretion. *Richards v Richards*, 310 Mich App 683, 699; 874 NW2d 704 (2015). To the extent that the trial court ordered the $10,000 offset as part of a property settlement, the court's factual findings are reviewed for clear error, and its dispositional ruling is reviewed to determine whether the ruling was fair and equitable in light of the facts. *Olson v Olson*, 256 Mich App 619, 622; 671 NW2d 64 (2003). A reviewing court should not substitute its judgment for that of the trial court on dispositional rulings "unless the appellate court is left with the firm conviction that the division was inequitable." *Sparks v Sparks*, 440 Mich 141, 152; 485 NW2d 893 (1992).

### B. ANALYSIS

The parties initially dispute whether the trial court did, in fact, order plaintiff to pay part of defendant's attorney fees. Plaintiff contends that the court did because, in the judgment of divorce, the court said that it was "the order of this Court that [plaintiff] shall contribute the sum of $10,000.00 toward the attorney fees and costs incurred by" defendant. Defendant contends that the trial court did not order attorney fees because it said in its oral ruling from the bench, "I'm going to not order attorney fees under the rule[.]"

It is not entirely clear who is right. On the one hand, a court speaks through its written orders, not its oral pronouncements. *In re Contempt of Henry*, 282 Mich App 656, 678; 765 NW2d 44 (2009). On the other hand, the judgment of divorce at issue was prepared by defendant and entered under MCR 2.602(B), which requires that the judgment prepared by a party comport with the court's earlier oral pronouncement. See *Jones v Jones*, 320 Mich App 248, 261 n 5; 905 NW2d 475 (2017). But MCR 2.602(B) also requires a court to independently verify that the proposed judgment comports with the court's oral decision before the judgment is entered. We thus tend to agree with plaintiff that the trial court's written order properly reflected the trial court's intent to order plaintiff to pay $10,000 toward defendant's "attorney fees and costs," despite saying from the bench that it was "going to not order attorney fees." The trial court spoke through its written order, and that order reflected both defendant's understanding of the court's oral pronouncement (because defendant was the one that prepared the order) and the court's own understanding of its earlier ruling (because the court independently verified as much).

Under MCR 3.206(D)(2):

> A party who requests attorney fees and expenses must allege facts sufficient to show that

> (a) the party is unable to bear the expense of the action, including the expense of engaging in discovery appropriate for the matter, and that the other party is able to pay or
>
> (b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply, or engaged in discovery practices in violation of these rules.

The trial court specifically found that defendant had the ability to pay, so attorney fees were not warranted under MCR 3.206(D)(2)(a), and the trial court did not make any findings to support awarding attorney fees under subrule (b). It follows that the trial court abused its discretion by ordering plaintiff to pay $10,000 "toward [defendant's] attorney fees and costs."

This conclusion would not change even if we disagreed with plaintiff that the $10,000 was an award of attorney fees, and credited instead defendant's assertion that the $10,000 payment was an equitable offset as part of a property settlement. Under defendant's framing, the trial court ordered a $10,000 offset because it found that plaintiff dissipated a marital asset—Baker ENT— by $10,000 when he withdrew that amount to pay his attorney fees. Plaintiff contends that this was inequitable because the trial court treated draws like this as part of the benefits that Baker ENT conferred on plaintiff, such that it should have been considered part of plaintiff's income. Defendant counters that there is nothing in the record to support that the trial court treated the specific $10,000 draw at issue as income.

While defendant is correct, that fact is not dispositive. The trial court adopted Sheridan's analysis to determine plaintiff's income, and neither Sheridan nor the trial court specified which draws were part of plaintiff's earnings and which were not. What we are left with is the trial court's reasoning that the benefits conferred on plaintiff by Baker ENT constituted plaintiff's income. Those benefits included draws that plaintiff took from Baker ENT to pay for personal expenses, such as the $10,000 draw that he took to pay his attorney fees. In other words, while not specified by the trial court, the $10,000 draw was plainly part of plaintiff' normal income from Baker ENT. And because the draw was part of plaintiff's normal income, the trial court should not have considered the draw as dissipating the marital asset. Accord *Elahham*, 319 Mich App at 124 (concluding that a shareholder loan, distributions, and automobile expenses paid by the defendant's medical practice did not constitute dissipation of a marital asset because they were part of the "defendant's ordinary business expenses and income"). Accordingly, if the $10,000 award to defendant was an equitable offset, we are firmly convinced that it was inequitable in light of the trial court's analysis for determining plaintiff's income.

Affirmed in part and reversed in part. No taxable costs pursuant to MCR 7.219, neither party having prevailed in full.

/s/ Colleen A. O'Brien
/s/ Michael J. Kelly